RECEIVED
NOV 2 1 2023
(Rev. 12/6/12)
TONY R MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT LOUISIANA
BY _____

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
_____ DIVISION

Hunter Boulware
Hunter Boulware  _____     Civil Action No.   5:23-cv-1674
                Plaintiff

                VS.                  Judge _____

Walgreens Inc. _____        Magistrate Judge _____
                Defendant

# COMPLAINT
## UNDER SECTION 706 (f) OF THE CIVIL RIGHTS ACT OF 1964

A.  Describe in your own words the employment practices about which you are complaining, identifying the persons, firms, companies, unions, agencies or bodies you say have engaged in such practices. Attach an additional sheet, if necessary.

See attached document
_____
_____
_____
_____
_____
_____

B.  Have you filed with the Equal Employment Opportunity Commission (EEOC) a charge relating to such practices?   Yes [✓]   No [ ]

C.  Have you received from the EEOC a letter notifying you of your "right-to-sue" respecting such charges?   Yes [✓]   No [ ]

If "Yes," attach a copy of such letter and notice, and state when you received same.

Date received: The date that I opened the Right to Sue letter may have been 26/Aug./2023, The EEOC has a log of my activity. The date that the EEOC issued that letter is 24/Aug/2023.

(Rev. 12/6/12)

D. Have you received from the EEOC a copy of its determination with regard to your charges?

Yes [✓]   No [ ]

If "Yes," attach a copy of such determination. Also, if you disagree with any of the EEOC's findings or conclusions, state why:

See attached

E. Give any other information you desire to disclose which supports your claim of discriminatory employment practices.

See attached

F. Under penalty of perjury, I declare that the information given in this complaint is true and correct.

Date: 21/Nov./2023

_Hunter Boulware_
(Signature)

3308 Survey Rd.
(Street Address or P.O. Box)

Shreveport, LA 71105
(City, State, Zip Code)

(318) - 200-7037
(Area Code)   (Telephone Number)

_____
(Witness)

_____
(Witness)

Page 2 of 2

Saturday, November 18, 2023

(1) Hunter Boulware
    3308 Surrey Rd.
    Shreveport, LA 71105
    hunterboulware45@gmail.com

(2) (a) Hunter Boulware
    3308 Surrey Rd.
    Shreveport, LA 71105
    Against
    Ryan Himes (personally)
    330 Williamsburg Dr
    Bossier City, LA 71115

  (b) Hunter Boulware
    3308 Surrey Rd.
    Shreveport, LA 71105
    Against
    Walgreen LA CO. INC. (EEOC No.: 461-2023-00458)
    108 Wilmot Rd.
    Mail Stop 3213
    Deerfield, IL 60015
    Kimberly G. Metrick
    Employment Law Department
    Kim.Metrick@Walgreens.com

  (c) Jeff Auguste (store manager) at Walgreen's
    300 Southfield Rd.
    Shreveport, LA 71105
    Against
    Hunter Boulware
    3308 Surrey Rd
    Shreveport, LA 71105

(3) This court has jurisdiction over this particular case since Ryan Himes' (my then immediate supervisor at the time of my termination from Walgreen's) may have treated me differently than any of the pharmacy technicians underneath his leadership in a discriminatory way (as it pertains to my gender), an issue for a federal court to determine, as a violation of this is a violation of Title VII of the Civil Rights Act of 1964, as it pertains to gender.

(4) **Explanation of facts & the relief that I seek the court to issue:**
If I were an employer (within a large corporation) requiring a secretary to work for myself, then (if I were still single within this hypothetical that is intended to shed light onto my sincere preference at the moment), then I would prefer to hire a female secretary over a male applicant equally qualified for the position. The rationale for having this preference is that there exists an opportunity for the business relationship with the secretary that I hire to become more than just a business relationship, at some indefinite time in the future (if she

Hunter Boulware<br>
3308 Surrey Rd.<br>
Shreveport, LA 71105<br>
Page 1 of 14

Saturday, November 18, 2023

too should wish this were the case), should I hire a female secretary over an equally qualified male applicant for the same position. This sincere preference of mine, that I have just described within the preceding sentence, is likely a very common preference for male employers or very likely, more generally stated males' preference to be around females more often than males in certain settings. Hooters (the restaurant) even knows this truth about males' sincere (but usually not openly articulated) preference of its male patrons within the restaurant industry. Hooters (the restaurant), despite the likely male gender of most of the senior managerial staff within said restaurant, has openly stated that its waitstaff shall remain exclusively female, despite equally qualified male servers applying for the waiting positions within the restaurant, resulting in numerous lawsuits filed against the company that have resulted in millions of dollars settled outside of court. The point that I am attempting to highlight within my stated preference herein (as it pertains to hypothetically hiring a secretary) is that the gender of the immediate supervisor (in my particular case the male gender of Ryan Himes) does not necessarily negate the possibility that said employer does not prefer to primarily work with genders opposite his own gender. More succinctly put just because Ryan Himes' gender is the same is my gender, does NOT necessarily make it impossible for Ryan to wish to have an all-female pharmacy technician staff over even a coed staff. Just as within the example that I have provided, Hooters (the restaurant) despite the likely gender of most of senior management (males), Hooters adamantly maintains that its waitstaff shall remain exclusively female. Hooters has stated that the gender of its waitstaff is an integral part of the serving experience within its restaurant.

(5) Walgreen's does not claim that its staff of pharmacy technicians should remain a particular gender, the way Hooters has openly stated. However, just as I would prefer a female secretary over a male secretary (within the hypothetical that I provided herein), it is entirely plausible that Ryan Himes may not only have a **preference but act on his preference by treating the employees directly under his leadership differently from each other solely because of the gender of the employee(s) rather than another metric. It is the application of the preference (a given gender over another gender) that should be of concern to courts rather than the desire, as desire is almost impossible to measure.**

(6) There is not a way to definitively measure the preference Ryan may (or may not have) as it pertains to the gender that he wishes to routinely work with. However, I can discuss Ryan's behavior and make reasonable inferences about the motives Ryan possesses from the treatment of my former coworkers (all of whom were female) versus the treatment of me (a male). Ryan routinely allowed female coworkers to belittle me throughout most of my time with him.

(7) Personally I have found that most of the time, if someone makes negative comments about you, then it is usually best to ignore those comments initially, since we are all human and our moods to some extent (some more than others) do fluctuate over time; it is entirely possible that a given worker has just one particular bad day and mistakenly takes it out on others while working. To attempt to address every perceived infraction that may arise in the workplace may be a mistake by management. However, there are cases, after repeated

Hunter Boulware
3308 Surrey Rd.
Shreveport, LA 71105
Page 2 of 14

Saturday, November 18, 2023

disrespect occurs that it may be time to address said infraction, as ignoring the behavior may strengthen the disrespect, not lessen the disrespect.

(8) For years, Ryan Himes has repeatedly allowed my coworkers to berate me daily as I have worked. Actually, not completely his fault, as one author has stated that "No one will ever do or say anything to you that you don't invite them to do. When you fail to stand up for yourself and what you want in your relationships, the other person [usually] sees your weakness…," [Corey Wayne]. For literally years, I have allowed my former coworkers' bad behavior towards me to continue, mistakenly believing that if I ignored their disrespectful behavior towards me by providing kindness towards them that my kindness would eventually lead them to show some respect for me. I was wrong about that. The same quoted author has stated that "Whatever you tolerate you invite more of." Although, for years I have attempted to follow most of the material within the popular book "How to Win Friends and Influence People," as it pertains to personal and work relationships, (as with any general principles) there are exceptions to attempting to apply the principles within the book blindly. I still believe that the book (just previously mentioned) contains a lot of helpful information, however (as with any general model) it inevitably fails at some point, as "Models are human inventions…Asking for a sophisticated explanation from a simple model is like expecting to get an accurate mass for a diamond using a bathroom scale." [PhD. S.& S. Zumdalh].

(9) I cannot be certain of Ryan Himes' preference as it pertains to which gender, he prefers to work around, or even if Ryan Himes has any preference to work with female workers over male workers, as I cannot read Ryan Himes' mind. However, what I can state with certainty is that on (at least on 2 separate occasions) Ryan has treated me considerably different from my coworkers (all of whom are female while I am male). Ryan Himes witnessed Grace Riomalos punch me in the face at least 2 times (likely 3 or more times) while inside the pharmacy on 12/Oct./2021, while on camera; in front of customers; and coworkers, one of which was Latoya Thompson.

(10) Imagine if I had punched a female coworker while working. Would that have not been reported by Ryan Himes? We know the answer to this rhetorical question. I would have (not only) been immediately terminated the day it happened but had I (hypothetically) punched any one of my female coworkers, then I would have had the police called on me immediately; I would have been in jail for that. Ryan Himes certainly would have reported that hypothetical scenario. However, I am quite confident that Ryan Himes never reported the infraction of Grace punching me immediately after Grace did so. Within Kim's position statement it is alleged that Grace Riomalos was issued a reprimand. Whenever Grace was issued the reprimand that Kim discusses I state with a great deal of certainty that Grace was only issued that reprimand after my mentioning that Grace hit me to Justin Jackson (the store manager). Ask yourself which of the following two scenarios is more likely:

(11)    Case (1): Management issues Grace a final written reprimand 2 months after Grace punching me and my reporting Grace to Justin 2 months after the actual punching **was not** connected to the issuing of Grace's reprimand…or

Saturday, November 18, 2023

    Case (2): Management issues Grace a final written reprimand 2 months after Grace punching me and my reporting Grace to Justin 2 months after the actual punching **was** connected to the issuing of Grace's reprimand...

(12) Again, I have not viewed the reprimand that was allegedly issued to Grace, however, I am QUITE confident that the date the reprimand was issued to Grace (if ever) will be slightly after the time of me mentioning the event of Grace punching me on 13/Dec./2021 to Justin Jackson, which was within a recorded meeting and therefore cannot be denied by him.

(13) **Ryan had 2 months to report the incident but failed to do so. Ryan's failing to do so also provides a threshold (or baseline) for what Ryan considers worthy of reporting.** Are you to tell me that Ryan thinks that physical violence against an employee is not worth reporting, but then Ryan strangely reports me allegedly calling someone "obese" (which is a demonstratively false statement, as the recording proves it to be false) somehow believes that reporting the "donut-incident" more worthy to be reported than Grace punching me!? This evidence strongly supports my claim of "wrongful termination" and **provides the actual reason for Ryan's false reporting.**

(14) "In Louisiana, **Act 461** has been enacted to address workplace violence, particularly in healthcare settings[12]. This act establishes duties and requirements of licensed healthcare facilities with respect to addressing and preventing workplace violence[12].

(15) One of the key provisions of this act is that it **prohibits retaliation by certain employers** in connection with the reporting of healthcare workplace violence[12]. This means that an employee cannot be terminated for reporting instances of workplace violence[3]. The law applies to regulated entities, which the legislation defines broadly and includes nearly all healthcare facilities in Louisiana[3]. **(\*\*\*note: I worked inside the pharmacy, as a pharmacy technician, as a healthcare worker).**

(16) I argue that tolling provisions should also be applicable as it pertains to my personal lawsuit against Ryan Himes (the supervisor), as had Walgreen's not exceeded the 30-day time limit (to then even exceed the extensions given by the EEOC investigator**), then I would have definitively known that Ryan Himes provided provably false information to HR and/or Justin Jackson (the 3rd parties in my defamation lawsuit against Ryan Himes, the supervisor) sooner than 1/May/2023, and then I would have been able to sue Ryan Himes (personally for his false and defamatory communication to HR and Justin Jackson (the defined 3rd parties within a defamation lawsuit against Ryan Himes personally)**. "**Equitable tolling**" should be applicable within my case against Ryan Himes, as it was known that I wished to pursue litigation against Walgreen's as early as Dec. 2022, as I certainly did file with the EEOC within this month, and thus proving that I was not only (possibly discriminated against because Ryan may have wished to have an all-female staff), but also prevented from working at any of the 8,600 Walgreen's nationwide, with *the particular lie told by Ryan Himes*. Only after Walgreen's position statement did I learn of what Ryan stated to HR and/or Justin Jackson, that I placed donuts into Samantha's lunch bag and called her morbidly obese, neither claim is true; each is demonstratively false. I argue for "equitable estoppel" or "equitable tolling" &/or **the "discovery rule"** be applicable

within my defamation case against Ryan Himes (as if Kim's assertions are not fabricated by Kim herself, then the objectively false claims within Walgreen's position statement against me as it pertains to the "donut-incident" must have come from Ryan Himes' concealment of his communication to HR &/or Justin Jackson); I vehemently argue that I did not specifically know what Ryan Himes claimed until after Walgreen's position statement was uploaded to the EEOC portal on 1/May/2023, and in light of this information, I ought to have the legal right to file a defamation lawsuit against Ryan Himes (specifically for his objectively false communication that directly led to my termination from the entire company).

(17) Below are screenshots supporting that Walgreen's delayed my formal request for their position statement several times. Walgreen's should not be rewarded for exceeding tolling provisions to then be able to potentially cite that I am "time-barred," as it pertains to (1) my primary claim of defamation against Ryan Himes (personally), followed by (2) my secondary claim of "wrongful termination" against Walgreen's (the company) for reporting an act of violence against me:

---

**From:** CARLOS MONTAS
**To:** employmentlawmailbox@walgreens.com; Christina.woodworth@walgreens.com
**Subject:** 461-2023-00458 Hunter Boulware v Walgreens
**Date:** Wednesday, April 5, 2023 7:59:00 AM

Good morning,

On February 15 2023, your office requested an extension of one month to provide the position statement for the above mentioned charge. Please provide the position statement by Friday April 7 2023.

If you have any questions or concerns, please feel free to contact me.
Sincerely,


Carlos Montas
Bilingual Investigator
U.S. Equal Employment Opportunity Commission
New Orleans Field Office
500 Poydras Street, Suite 809
New Orleans, LA 70130
Phone: 504-635-2539
Work cell: 504-491-8702

Saturday, November 18, 2023

**From:** CARLOS MONTAS
**To:** employmentlawmailbox@walgreens.com; christina.woodworth@walgreens.com
**Subject:** 461-2023-00458 Hunter Boulware v Walgreens
**Date:** Tuesday, April 25, 2023 9:06:00 AM

Good morning,

I am writing because the position statement for the above-referenced charge was initially due January 20th, 2023. After two one-month extensions, your position statement was not provided on April 7, 2023. Failure to provide the requested information and material by Friday, April 28, 2023, may result in the EEOC making an adverse inference, issuing a determination against the Respondent, and/or exercising its authority to command production of the information and material through a subpoena under 29 C.F.R. 1601.16.

Sincerely,
Carlos Montas
Bilingual Investigator
U.S. Equal Employment Opportunity Commission
New Orleans Field Office
500 Poydras Street, Suite 809
New Orleans, LA 70130
Phone: 504-635-2539
Work cell: 504-491-8702

(18) Regardless of the actual reason Ryan Himes may have terminated my employment from the entire company (Walgreen's) was, then Ryan Himes would still be utterly guilty of defaming me to Walgreen's (the company). Even if I am wrong about Ryan's actual motives to terminate me, which are provided herein (which I do not think that I am, but momentarily assume that I am wrong about all of Ryan Himes actual motives for terminating me), then Ryan Himes would still be guilty of defamation. To support the preceding claim consider that Ryan Himes wished to have simply gotten rid of me (as an employee) for simply wearing red shoes one of my working days with him (or some other arbitrary reason; this would not occur in the real world, but assume momentarily assume it is true for this argument), then Ryan Himes would still be utterly guilty of defamation, as Ryan Himes falsely communicated to (HR &/or Justin Jackson: the 3rd parties as it pertains to my potential defamation lawsuit against the supervisor [Ryan]) that I "harassed" Samantha Conner on 11/Feb./2022 (or very near this date). The audio evidence from inside the breakroom (from 11/Feb./2022) clearly, unambiguously, & irrefutably support that I offered Ryan Himes donut-holes, followed by Morgan Meeks, & then followed by Samantha Conner. The audio evidence (found after my termination) proves (without any doubt) that I am utterly innocent of what was claimed by Ryan Himes to (Walgreen's, the company). The false communication to Walgreen's (the company) and the company (Walgreen's) refusing to allow me to transfer to any one of the over 8,600 Walgreen's stores in America is the dereliction and the case for

Hunter Boulware
3308 Surrey Rd.
Shreveport, LA 71105
Page **6** of **14**

Saturday, November 18, 2023

    defamation against Ryan Himes. Even if Ryan Himes mistakenly (but nonetheless sincerely believed) that I had "harassed" Samantha Conner while inside the breakroom, then it makes Ryan Himes utterly culpable for defaming me. I view my potential defamation claim against Ryan Himes as if Ryan Himes is a customer providing false communication to the company (Walgreen's), and then the company terminates my employment without supporting evidence that I have "harassed" Samantha.

(19) Because Ryan Himes was vague in his wording within the written reprimand that was issued on 28/Feb./2022 to me, then it was difficult to prove Ryan Himes' claim false. It took many months for me to view messages between Samantha and myself over the years to strongly support that not only was Ryan Himes' claim "that I harassed Samantha" false around the time that the reprimand was issued to me by him, but after having viewed my many messages with Samantha, I now firmly believe that I have not ever harassed Samantha, even in the past.

(20) To help the court understand my defamation case against Ryan Himes better I will provide a hypothetical that helps illuminate the essence of my situation with Ryan's claim as it pertains to me:

(21) Assume that Ryan Himes issued a reprimand to me on 28/Feb./2022 for "harassment" because at the time Ryan sees me hug Samantha. I believe that Ryan has issued the reprimand for hugging Samantha. I then attempt to go through messages, and pictures of Samantha and myself over the years to help refute Ryan's claim. I then later discover that Ryan claimed to the company (Walgreen's) that Ryan had witnessed me fondling Samantha's breasts while at work?! Although I knew the just of what Ryan had claimed as the reprimand was issued because of the vagueness of the reprimand, then it is difficult for me to argue that Ryan's claim is false, as it is my belief that Ryan saw me hug Samantha, and my refutation to that claim was the many pictures and messages between myself and Samantha to establish that she and I had a propinquity that allowed for a friendly hug. Even though (within this hypothetical scenario) Ryan's claim that I fondle Samantha's breasts, as Samantha and I were working is a subset of "harassment," Ryan's claim that I had fondled Samantha's breasts while she and I worked is a provably false claim and the specificity of Ryan's actual claim to the company, is more egregious than simply a hug, as I had originally thought to why Ryan issued the reprimand.

(22) The above fictitious hypothetical is an extremely close parallel to my situation as it pertains to my potential defamation claim against Ryan Himes.

(23) Even if you disagree with my evidence that supports that I never harassed Samantha, then you would still have to find Ryan Himes guilty of defamation. Proof of the preceding sentence can best be achieved by again providing a fictitious hypothetical:

(24) Assume that I had a history of being a thief. Ryan then reports that I stole an item at Walgreen's on 28/Feb./2022. Ryan's supporting evidence for his assertion to HR is that I used to be a thief and therefore must have taken an item from the store. Because of my past then I am doomed to then be found guilty of theft again? Even though I changed my ways??

(25) Again, the above scenario is a fictitious hypothetical only. The purpose of the hypothetical is to state that even if you were to find me guilty of having harassed Samantha in the past (which I sincerely do not believe is the case after having viewed all the messages she and I have had over the years), then even if you were

Hunter Boulware<br>
3308 Surrey Rd.<br>
Shreveport, LA 71105<br>
Page 7 of 14

Saturday, November 18, 2023

to have found me guilty of passed harassment, then you should still find me innocent of what Ryan Himes claimed around 28/Feb./2022 to the company (Walgreen's), making Ryan Himes guilty of defaming me.

(26) In addition to all the information that I have thus far presented, the audio evidence is timeless and therefore, witnesses are not necessary, which provides yet another reason my defamation case against Ryan Himes should be allowed.

(27) I argue for "Wrongful Termination" as the actual rationale for my termination from the entire company, as it is illegal to terminate an employee (in this particular case "me") for reporting workplace violence against said employee (myself) from a former coworker (Grace). And Ryan Himes' false reporting of the now known utterly fabricated "donut-incident" strongly helps support that Ryan's false reporting of the "donut-incident" very likely has its roots in my reporting of an event that actually occurred (Grace punching me).

(28) It is my strongest preference to be allowed to sue Ryan Himes personally for his false reporting. If Ryan Himes should be ordered to pay the entirety of my retirement fund to me for his false & defamatory claims communicated to Justin Jackson &/or HR that directly led to my termination from the entire company. Ryan Himes should be ordered to pay $50,000 to me and then communicate to Walgreen's that he defamed me by reporting what he did. If Ryan is unable to successfully argue that I should not have been terminated to Walgreen's, as I sincerely offered donut-holes to Samantha, rather than the lie that he obviously communicated to Walgreen's, then I will have no other choice but to sue Walgreen's (the company) for "wrongful termination," as Ryan Himes was an agent within Walgreen's (the company).

(29) If for some reason this court does not allow my reasonable request to claim defamation against Ryan Himes (personally), &/or "wrongful termination," then I wish to proceed with a gender discrimination charge against Walgreen's (the company). The strongest evidence for the claim of "differential treatment" between genders (male & female), is Ryan Himes & Justin Jackson knowingly NOT reprimanding Samantha (a female) AT ALL for Samantha tossing donut-holes at me on 11/Feb./2022. Ryan Himes witnessed that occur, as he was inside the breakroom; Ryan Himes was the sole person to have reported the "donut-incident," as Samantha adamantly did not wish to report any infraction against me (as if there was anything to have reported against me, as I did not commit any wrongdoing). As I was inside the meeting held on 28/Feb./2022, Ryan Himes & Justin Jackson were very aware that Samantha had tossed donut-holes at me, as I repeatedly mentioned that this occurred. Yet Ryan & Justin each repeatedly lied to me, stating to me that they were "dealing with her (Samantha). We know that "dealing with her (Samantha)" meant management would not reprimand Samantha at all; we know this is the case, as Samantha was NEVER reprimanded for tossing donut-holes at me. Samantha no longer works for the company and Samantha has provided a statement stating that she was NEVER reprimanded for tossing donut-holes at me. I argue that Samantha's behavior was somewhat of a paradigm to how Ryan perceived events. Events may have been perceived (in his mind) that I was the person to have done wrong and the evidence of this "truth" is the bad behavior from the female workers that were routinely overlooked by Ryan Himes. I was not permitted to disagree with female workers, even if I politely disagreed with the workers. Yet the female workers were permitted to

Hunter Boulware
3308 Surrey Rd.
Shreveport, LA 71105
Page **8** of **14**

Saturday, November 18, 2023

consistently berate me the entire shift for years, despite my being polite to my coworkers for literally years prior to my termination. When I requested a transfer while inside the meeting held on 28/Feb./2022, I was denied a transfer by Justin Jackson yet strangely terminated? It was later claimed by Justin Jackson that my termination was connected to my usage of 12 vulgar words that were not directed at either of the two managers within the meeting. The 12 vulgar words were directed at my frustration from my coworkers' frivolous daily complaints for years at this point. Although (by my admission) the usage of what society defines as "vulgar words" is not ideal, I was inside the office (away from customers' ears). And Justin Jackson permitted the usage of vulgar words within the office, as I recorded all meetings with Justin and myself. And in exactly NONE of the meetings did Justin once tell me that I should not use "vulgar words" while inside the office with him. In fact, on 11/Feb./2022, (the exact same day as the "donut-incident"), Justin Jackson can be heard on audio within a meeting he and I were having whereby he used 7 vulgar words in rapid succession before I politely asked Justin to stop speaking as I was attempting to concentrate on writing, as Justin's talking was distracting to my writing. It may be stated that Walgreen's has the right to terminate my employment for "any reason or no reason at all;" however, the facts that I have presented strongly support that the reason presented by management for my termination most certainly differs from the actual reason for my termination. The audio recording that I have from the last meeting held on 28/Feb./2022, contains my usage of 12 vulgar words, not directed at either of the 2 managers. Again, Justin Jackson permitted vulgar language while inside many previous meetings, as I have Justin on audio using exactly 7 vulgar words in rapid succession proving **that Justin's stated reason for termination differs from his actual reason for the termination**. In addition, at no point did Justin tell me to not use vulgar words as I described my coworkers' frivolous complaints, as I stated that I would quit at that particular location to then be rehired at a neighboring location. It cannot be stated that Justin did not wish to interrupt me either, as Justin rudely interrupted me multiple times, **yet strangely never interrupted me** to tell me to not use another vulgar word to describe my coworkers' frivolous complaints. There is a difference in time of perhaps 20 min from the 1st vulgar word uttered from myself and the last one uttered, and yet Justin strangely did not state once to refrain from using "vulgar words" in that meeting or even in previous meetings. To my knowledge Justin still works for the company, yet it is known by the company that Justin has used 7 vulgar words, on 11/Feb./2022 & it is also known by the company that Justin has used vulgar words within previous meetings, as I recorded all meetings with Justin & I even presented those recordings (of Justin's usage of vulgar language) to HR, proving that the company knows about his usage of those words; yet he still works for the company, **thus proving that my stated reason for termination is a pretext (or better stated lie).** Ryan Himes even heard Samantha say, **"Grow the Fuck up,"** as Samantha tossed donut-holes at me. Ryan and Justin terminate me (a male) for alleged vulgar language, yet Samantha is not only not reprimanded for tossing donut-holes at me, but Samantha is also not reprimanded at all for using **"fuck"** directed at me, while inside the breakroom!? All this evidence convincingly proves that the stated reason for my termination differs from the actual reason, **and the actual reason is likely (1) for reporting Grace punching me, &/or (2) for allowing "differential treatment" (under Title VII, as it**

Hunter Boulware<br>
3308 Surrey Rd.<br>
Shreveport, LA 71105<br>
Page <b>9</b> of <b>14</b>

Saturday, November 18, 2023

**pertains to gender) to occur as it pertains to the issuing of reprimands, which are each illegal reasons.**

(30) The remedy that I seek is to be allowed to sue Ryan Himes (the supervisor) for providing objectively false information to (HR &/or Justin Jackson: the defined 3rd parties), thus resulting in the loss of my 16-year-long career with the company (Walgreen's). Ryan should be ordered to pay the entirety of my retirement fund back to me because I spent months and months researching and writing about my extremely long relationship with Samantha Conner, unknowingly spending that time in vein, as Ryan's falsely communicated information to (HR &/or Justin Jackson) that directly led to my termination was solely issued to me on 28/Feb./2022 for what allegedly occurred inside the breakroom only, rather than any event that occurred outside of work, which would require a lot of discussion to refute Ryan's claim of "harassment." If Ryan Himes is unsuccessful at persuading Walgreen's to hire me back, then I seek **considerably more than $50,000 from Ryan Himes** for his false & defamatory reporting to (HR &/or Justin Jackson: the defined 3rd parties), as I wished to have the option to continue to work for Walgreen's, an option that I would have had Ryan not terminated me for an act of kindness from the entire company (Walgreen's).

If the court (for some reason) is not persuaded by my extremely compelling reasons to be allowed to file a defamation lawsuit against Ryan Himes (personally), then I propose that I be allowed to sue the company (Walgreen's) for "wrongful termination," as it is more than obvious to me that the actual reason that Ryan reported me as the perpetrator, while Samantha the victim to (HR &/or Justin Jackson) was a method for Ryan to retaliate against me for simply mentioning to Justin that Grace punched me on 13/Dec./2021. If (for some reason) I have not persuaded the court, that Ryan's actual reason for my termination is retaliation for (my reporting an act of violence by Grace against me to Justin), (an illegal reason for termination), then I ask the court to consider Ryan's actual reason for falsely reporting me to (corporate Walgreen's) as an example of "differential treatment" (a violation of Title VII, as it pertains to gender discrimination) as the actual rationale for Ryan's false reporting to (corporate Walgreen's), as I was issued a reprimand for Samantha's bad behavior while inside the breakroom, while however, Samantha (a female coworker) was not at all reprimanded. And the same argument could be made for "differential treatment" as it pertains to Grace not being issued a reprimand for 2 months (until after my mentioning Grace punching me to Justin). And even the daily berating from a few of my female coworkers that occurred (for literally years) as Ryan Himes worked as my supervisor supports "differential treatment," yet another example of a violation of Title VII, as it pertains to gender, **as there was clearly one standard for female workers, while however, another standard for male workers as Ryan Himes was the supervisor at Walgreen's.**

Inconclusion, for all these reasons, I file this federal lawsuit against (1) Ryan Himes for defamation, followed by (2) Walgreen's (a) for "wrongful termination" &/or (b) for "differential treatment" a violation of Title VII, as it pertains to gender.

The damages that I seek are numerous:
    (a) from lost wages from Ryan's false reporting,
    (b) and the loss of my 16-year-long career to **any of the over 8,600 Walgreen's locations across America** with the particular (defamatory) lie that was told by

Saturday, November 18, 2023

Ryan Himes to Walgreen's (corporate), which is a considerable issue to me. As it is my belief that the workforce (that I am a part of) is only willing to pay only slightly more than what others are willing to pay for a given worker's work in an effort to keep said employee. Employers are not usually willing to pay for the direct proportion of the value derived from said given employee's work, as seems to be commonly believed by most individuals. To reiterate, in general (in market economies), an employer is only willing to pay slightly more than a competitor is willing to pay to prevent the competitor from taking said given worker. By Ryan preventing me from ever working at Walgreen's, one of the 3 hugest pharmacy chains in America (CVS, Walgreen's, & Walmart) who employee pharmacy technicians, Ryan Himes has lowered my market value to those who hire pharmacy technicians, as the market (in general) only pays slightly more than a competitor to prevent a given employee from working for a competitor, rather than paying a given worker for the value that is directly proportionally derived from the worker's work, as is likely commonly believed by most individuals.

(c) the loss of over a year and a half of time spent writing in an effort to have the option to work for a Walgreen's location different from the location (store #05992). It took a considerable amount of time to refute the claim that I (in my view) have never harassed Samantha Conner even prior to the now-known fictitious "donut-incident" reported by Ryan Himes to Walgreen's (corporate).

(d) the possible irreparable harm to my relationships between (Suwetha & even Kendall) that resulted from my extreme focus on writing to acquire my position of pharmacy technician at Walgreen's again. As I viewed many, many Facebook messenger messages between Samantha and myself over the years, in an effort to dispute what I **thought Ryan's claim was**, I neglected almost all interaction with friends. I even asked my friend, Suwetha to leave my apartment as I wrote, as I wished to intensely concentrate on my writing. Suwetha had been homeless for months and months because of the false claim by Ryan Himes to Walgreen's (corporate).

(e) If I am not able to file a personal lawsuit against Ryan Himes for defamation, then I wish to sue the company for over $100,000 in damages as it pertains to the other claims discussed herein.

(f) My potential defamation case against Jeff Auguste (and, by my own admission, the weakest of all claims herein):
After the meeting on 28/Feb./2022, I left store number 05992 to then speak with Jeff Auguste. My intention was to quit the location that I last worked for in an effort to work for the location that Jeff worked at. Around this time Justin Jackson (the store manager at store #05992) was newly hired and Justin Jackson was Jeff Auguste's protégé. As I was inside the Walgreen's store Jeff worked at, I was friendly with Jeff as I asked to speak with him, and as I was there, I was off Walgreen's clock and away from the Walgreen's that I worked at; that is, I was there speaking with Jeff on my own time, as a customer, on my own time. I was under the mistaken (but apparently fallacious)

Hunter Boulware
3308 Surrey Rd.
Shreveport, LA 71105
Page 11 of 14

Saturday, November 18, 2023

assumption that Jeff was a friendly acquaintance, and more than just a former manager, from just a few months prior (at this time). The conversation that Jeff and I had was recorded, as I did not stop recording from (my meeting with Ryan and Justin) an hour (or two) prior to speaking with Jeff. Within that particular conversation with Jeff and myself (held on 28/Feb./2022) I am, on the whole, friendly and cordial with Jeff as I mistakenly discuss my problems with Justin Jackson and my desire to transfer to the store that he works at. Our actual conversation held on 28/Feb./2022 is in very stark contrast to what Jeff purported within "Exhibit H." After having known Jeff, it is my belief that Jeff assumed that I was guilty of having harassed Samantha, and as such, I had no right to have opposed any discipline to me from Justin Jackson that was issued on 28/Feb./2022. It is obvious (to me), that it never occurred to Jeff that I was utterly innocent of what was claimed within the reprimand issued on 28/Feb./2022. After viewing Jeff Auguste's testimony, from 1/March/2022, Jeff alludes to (I argue) most who read "Exhibit H" as someone who was unhinged. It is likely because of Ryan's false reporting of an act of kindness to Samantha (relabeled as malice by Ryan), along (with Ryan & Justin)'s somewhat unrepresentative testimony while inside the meeting itself held on 28/Feb./2022, and then followed by Jeff Auguste's (again, misrepresented testimony of my actual conversation with Jeff) that the company (Walgreen's) decides to terminate me. I had 3 managers place their thumbs on the scale (all at approximately within 2 days) that led to my termination. At best (for the opposing side), I am issued a final written reprimand for an act of kindness mislabeled as malice, to then be issued a reprimand (while already inside a reprimand), to then be issued a comment that leads most who read Jeff Auguste's statement, as if I am unhinged. I sought to speak with Jeff to discuss perceived "unfair treatment" from Justin, while Jeff (likely mistakenly thought Hunter is guilty) who then further aided in Justin Jackson's utterly unjustified treatment of me for sincerely offering a friend food. Although within "Exhibit H," Jeff does not outright state that I have done something the company (Walgreen's) does not wish; it is, however, certainly implied by Jeff that I have. Firstly, if that was not Jeff's attempted communication to Walgreen's (corporate), then there would not have been any statement to Walgreen's made by him to Walgreen's (corporate). The mere presence that there is a statement from Jeff is proof that Jeff wished to have further implicated my unworthiness to have continued employment for Walgreen's. To help illuminate my case against Jeff Auguste, as a defamatory case against him, consider the following fictitious scenario whereby Jeff states to Walgreen's (corporate):

(g) That he saw me (on one particular day) "holding a bag of Skittles...and then he "saw me look around" and then he "saw me place a bag of Skittles swiftly into my pocket"! Suppose that it is later discovered that Jeff did not lie about what he saw, as he observed some of what is claimed; however, Jeff conveniently left out that he

Saturday, November 18, 2023

      saw me purchase the bag of Skittles prior to "holding the bag of Skittles...me look around...and...saw me place the bag of Skittles swiftly into my pocket"?

(h) Although Jeff in the above fictitious scenario did not lie, he did leave out that I purchased the bag of Skittles to Walgreen's (corporate), the only piece of information that is important to Walgreen's; the part of my innocence of theft.

(i) In a similar way to the hypothetical fictitious scenario, Jeff would be able to state that "...he (Hunter) used language that was not work appropriate (implying to the reader that I used profanity loudly on the floor with him, as we spoke, which is not what actually occurred)...I could tell he was getting extremely hostile about the situation and I tried to calm him the best I could and ...as Hunter has a hard time with anger management"??

(j) Most of what Jeff has written implies that I was belligerent as I was speaking with him that day about how I was being treated utterly unfairly by Justin Jackson. Again, I have the entirety of that conversation that was mentioned within "Exhibit H." The actual conversation differs from Jeff's version considerably. If the judge presiding over this case wishes that I present that information, then I can present it too. There is one aspect within my conversation on 28/Feb./2022 that I certainly do not agree with as I spoke with Jeff that day. And that part was something similar to I suppose that I am guilty of past harassment as it pertains to Samantha. I vehemently do not agree with this in hindsight now, especially after thoroughly reviewing my messages from Samantha. Samantha is the person to 1st bring up her weight (not me), and repeatedly so. Samantha is the person to adopt "Hippo" as a nickname at some point, which is completely corroborated by several of the messages that she sends to my Facebook messenger account. Samantha later changed her mind about her nickname, as my relationship with her changed. But in hindsight, I sincerely do not believe that I have harassed Samantha (even in the past). But even if the judge presiding over this case (or others) disagree with this then it would not matter much, as I am utterly guilty of harassing Samantha Conner on (or there about 28/Feb./2022).

(k) Potential Remedy, as it pertains to Jeff Auguste's statement to Walgreen's (corporate):

(l) I am not even sure that I legally have a viable defamation case against Jeff Auguste for "Exhibit H," as Jeff could state that what was written was his opinion only, as a defense? However, if "defamation by implication" is within the court's discretion, then I ask the court to review this as being a viable defamation claim against Jeff Auguste, since the "discovery rule" certainly would be applicable within this particular defamation case, as I did not discover of Jeff's "implied defamatory" comment to Walgreen's (corporate) until after Kim (Walgreen's current attorney) uploaded the position statement on 1/May/2023 to the EEOC portal.

(m) If there is a potentially viable defamation case against Jeff Auguste, then I would not ask much from Jeff (as if I am honest with myself), for, although Jeff should have (in my view) been forthright about what took place to

Saturday, November 18, 2023

Walgreen's (corporate) as he and I spoke on 28/Feb./2022, it is my belief that Jeff made "Exhibit H" solely [because Jeff incorrectly assumed that Ryan's false reporting should not have been questioned and that I did not show "humility" for "allegedly having harassed Samantha" while inside the breakroom on 28/Feb./2022].

Hunter Boulware
3308 Surrey Rd.
Shreveport, LA 71105
Page **14** of **14**

(Rev. 12/6/12)

# INSTRUCTIONS FOR FILING A LAWSUIT
## UNDER THE CIVIL RIGHTS ACT OF 1964 (EEOC 42:2000)

This is in response to your inquiry about a lawsuit you may wish to bring under Title VII of the Civil Rights Act of 1964. Under this law the Court is, upon application by a complainant, permitted to appoint an attorney for the applicant and to allow commencement of the action without prepayment of fees, costs or security.

Any such application is, at the direction of this Court, to be in writing and to be filed with this office. Forms for these applications are available upon request or on our website (www.lawd.uscourts.gov).

You are cautioned that any lawsuit under Title VII to be brought by you or on your behalf must be filed within 90 days after receipt by you of the EEOC's "right-to-sue" notice. A delay on your part in filing an application for appointment of an attorney or waiver of prepayment of fees may result in loss of rights under Title VII.

The clerk will automatically refer any motions you submit in connection with your complaint to the appropriate judge or magistrate judge, and will promptly send you copies of any orders signed in response to your motions. If your case is allowed to be filed, the order will reflect a Civil Action number which you should provide with all future inquiries and pleadings.

If you need additional copies of this application form or further information, please advise this office.

Very truly yours,

TONY R. MOORE
Clerk of Court
300 Fannin Street, Suite 1167
Shreveport, LA 71101-1167
318-676-4273